## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHANIE ROSS DESIMONE, Individually and on behalf of the Estate of Patrick Dunn and as the Parent and Next Friend of ALEXANDRA DESIMONE, a minor,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>KINGDOM OF SAUDI ARABIA<br><br>　　　　　Defendant. | )<br>)<br>)<br>)　　Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

Plaintiffs, through undersigned counsel, respectfully bring this action against the Kingdom of Saudi Arabia, and allege as follows:

1.　　On September 11, 2001, nineteen members of the terrorist organization Al Qaeda, fifteen of whom were citizens of the Kingdom of Saudi Arabia, hijacked four commercial airliners, and used those planes as weapons in a coordinated terrorist attack upon the United States and its citizens (the "September 11th Attacks").

2.　　The September 11th Attacks represented a single targeted operational strike, carried out as part of Al Qaeda's broader and ongoing campaign to wage jihad against the United States.

3.　　Al Qaeda's ability to conduct large-scale terrorist attacks was the direct result of the support Al Qaeda received from its material sponsors and supporters, including the Kingdom of Saudi Arabia ("the Kingdom" or "Saudi Arabia").

1

4.      The Kingdom willingly provided material support to Al Qaeda for more than a decade leading up to September 11, 2001 with knowledge of Al Qaeda's intent to conduct terrorist attacks against the United States, and an awareness that Al Qaeda would use the support provided by the Kingdom to achieve that objective.

5.      Absent the support provided by the Kingdom, Al Qaeda would not have possessed the capacity to conceive, plan and execute the September 11th Attacks.

## JURISDICTION

6.      Plaintiffs bring this action pursuant to the Anti-Terrorism Amendments to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, et seq.

7.      Jurisdiction in this Court arises pursuant to 28 U.S.C. §§ 1605A, 1605B, 1330(a), 1331 and 1332(a)(2).

8.      On September 28, 2016, Congress passed the Justice Against Sponsors of Terrorism Act (JASTA), which provides jurisdiction in any case where money damages are sought against a foreign state for physical injury to person, property or death occurring in the united States and caused by: (1) an act of international terrorism in the United States; and (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment or agency, regardless where the tortious act or acts of the foreign state occurred. 28 U.S.C § 1605B(b).

9.      Pursuant to 28 U.S.C. § 1605B(c), a national of the United States may bring a claim against a foreign state in accordance with 18 U.S.C. § 2333, the Anti-Terrorism Act ("ATA").

10.     The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate,

2

survivors, or heirs may sue thereof in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

11.     JASTA further amended the ATA by clarifying that in any action for an injury arising from an act of international terrorism, liability may be asserted as to any person who aids and abets an organization that had been designated as a foreign terrorist organization by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

12.     The amendments made by JASTA specifically apply to any civil action "arising out of an injury to a person, property, or business on or after September 11, 2001.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(f)(4).

## PARTIES

14.     Decedent Patrick Dunn ("Patrick") was a United States citizen and a commander in the United States Navy.  Patrick was an employee at the Pentagon where he worked as a planner and strategist.  On September 11, 2001, Patrick was killed when the hijacked Boeing 757 airline crashed into the Navy Command Center.

15.     Plaintiff Stephanie Ross DeSimone ("Stephanie") is a United States citizen and the Personal Representative of the Estate of Patrick Dunn.  Stephanie was married to Patrick in Washington D.C. in October 1999.  In September 2001, Stephanie was two (2) months pregnant with their first child, Alexandra DeSimone.  At approximately 3 a.m. on September 12, 2001, Stephanie was told that her husband had died in the September 11th Attacks.

16.     Plaintiff Alexandra DeSimone ("Alexandra") is the daughter of Stephanie and Patrick Dunn.  Alexandra was born on March 15, 2002, six months after the death of her father.

3

Alexandra is a United States citizen and a current resident of California.

17.     Defendant Kingdom of Saudi Arabia ("the Kingdom" or "Saudi Arabia") is a foreign state within the meaning of 28 U.S.C. § 1391(f) and1603(a). Saudi Arabia maintains an Embassy within the United States at 601 New Hampshire Avenue, N.W., Washington, D.C. 20037.

18.     At all material times, Saudi Arabia, through its officials, officers, agents and employees, provided material support and resources to Osama bin Laden ("bin Laden") and Al Qaeda.  The support provided by Saudi Arabia to bin Laden and Al Qaeda assisted in or contributed to the preparation and execution of the September 11th attacks and the extrajudicial killing of Patrick Dunn.

## **BACKGROUND**

### A.  The History of Al Qaeda

19.     In or about 1989, Osama Bin Laden, and others, founded an international terrorist group that became known as "Al Qaeda".  Al Qaeda was formed in the wake of the jihad against the Soviet occupation of Afghanistan which served as a rallying point for Islamic extremists in the Middle East.

20.     In 1980, Bin Laden travelled to Afghanistan to participate in the jihad, and gained prominence for his role in financing and establishing the infrastructure that sustained the Arab-Afghan fighters, commonly referred to as the mujahideen. According to the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"):

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the "the Golden Chain," put together mainly by financiers in Saudi Arabia and Persian Gulf states. Donations

4

flowed through charities and other nongovernmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen or "holy warriors."

21.     In establishing Al Qaeda, bin Laden sought to create a multi-national Islamic army to challenge the "democratic West" and to engage in armed combat in furtherance of the ultimate objective of establishing a Pan-Islamic Caliphate.

22.     In pursuit of its goals, Al Qaeda employs a range of operational tactics and initiatives in furtherance of its coordinated global strategy which includes high profile terrorist attacks.

23.     Al Qaeda has devoted a significant portion of its resources to support regional jihadist organizations engaged in regional conflicts. Al Qaeda provides funding and logistical assistance to local extremist and terrorist organizations, in support of their military and terrorist activities. Additionally, Al Qaeda deploys its own members to fight in conflicts, train new volunteers, and assist in the planning and execution of terrorist attacks.

24.     Through its engagement in regional jihad campaigns, Al Qaeda seeks to establish and support radical Islamic regimes and extend its sphere of influence, as critical components of its long-term objective to eradicate democratic societies.

25.     In describing the importance of these regional military campaigns within the overall context of Al Qaeda's jihad against the West, a 1998 Department of Defense Intelligence Report states:

> [Al Qaeda] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination.
>
> The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological

weapons (Jikhad). Further, radical Islamic (predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

26.     Al-Qaeda's participation in these regional jihad campaigns enabled Al Qaeda to acquire the global infrastructure needed to plan and execute sophisticated international terrorist attacks, including the September 11th Attacks.

27.     According to the 9/11 Commission, Al Qaeda's operational involvement in regional conflicts between 1988 and 1998 served to establish the organization as the leader of the jihadist movement against the West and directly enhanced Al Qaeda's operational capacity to carry out large scale terrorist attacks:

> By the time he issued his February 19, 1998 declaration of war, bin Ladin had nurtured (the Al Qaeda) organization for nearly ten (10) years. He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future.

28.     The findings of the 9/11 Commission further confirm that Al Qaeda relied on its global infrastructure in planning and coordinating terrorist attacks, and that Al Qaeda could not have successfully mounted those attacks absent the resources and money amassed by the organization over the thirteen years preceding the Attacks.

29.     The 9/11 Report confirms that: (1) plans for the September 11th Attacks were carefully vetted through Al Qaeda's most senior leadership for nearly six years while those leaders were living in safe houses funded by Al Qaeda's financial supporters; (2) the individuals selected to participate in the Attacks were chosen from a pool of potential candidates recruited, trained, and indoctrinated with funds provided by the organization's supporters; and (3) Al Qaeda utilized a sophisticated global communication network capable of evading the

surveillance and intelligence operations of the United States and its allies, the development and existence of which was also dependent on the financial sponsorship of Al Qaeda's supporters

30.    The Al Qaeda organization required approximately $35 million annually to support its mission of global jihad and sustain the infrastructure required to sustain the September 11th Attacks.

31.    Al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities.

32.    To realize these immense fundraising needs, Al Qaeda relied on da'awa organizations (frequently described inaccurately as "charities"). As the United Nations Security Council Committee explained:

> From its inception, al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programs. Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al-Qaida. The roots of these charity networks stem from the anti-Soviet Jihad in Afghanistan during the last 1980s. During that time, al-Qaida could draw on a number of state-assisted charities and other deep pocket donors that supported the anti-Soviet cause.

> Today, al-Qaida continues to rely heavily on those charities to facilitate and mask the collection and movement of its funds.

33.    Al Qaeda's development into a global terrorist network was funded primarily by the money and other material support it received from the Kingdom and purported charities acting as agents and alter-egos of the government of the Kingdom of Saudi Arabia, many of which worked with the Al Qaeda leadership during the Afghan jihad. These governmental agents served as the primary conduits for channeling financial, logistical, operational, and ideological support

for Al Qaeda's global jihad for more than twenty years.

34.     Organizations described as Islamic da'awa organizations were created by the government of the Kingdom to propagate a radical strain of Islam throughout the World..

35.     Under the direction of the Saudi government, and especially the Kingdom's Ministry of Islamic Affairs, these organizations pressed the view that Western society, under the leadership of the United States, is conducting a coordinated "Western Cultural Attack" on Islam, designed to destroy Muslim society as a predicate for Western conquest of Muslim territories.

36.     These organizations believe that this so-called "Western Cultural Attack must be aggressively countered through jihad and worldwide indoctrination into Wahhabi Islam, a strategy the Kingdom promoted and implemented through government agencies, state controlled media, government sponsored publications, and a variety of other channels.

37.     Consistent with this view, the Saudi government controlled entities, organizations and charities have embraced Al Qaeda and its affiliates as partners, and actively supported Al Qaeda's global jihad from the organization's inception.

38.     Beyond the massive financial sponsorship of Al Qaeda's global jihad, the Saudi government, through its agents, officials and purported charities, has been intimately involved in all aspects of Al Qaeda's operations including: (1) raising and laundering funds on behalf of Islamic terrorist organizations and associated separatist movements, including Al Qaeda; (2) channeling funds to Islamic terrorist organizations, fighters and associated separatist movements, including Al Qaeda; (3) providing financial and logistical support and physical assets to Islamic fighters and terrorists, including Al Qaeda; (4) aiding and abetting Al Qaeda's terrorist activities, including the planning, coordination, funding and execution of terrorist attacks; (5) permitting Islamic fighters and terrorists, including Al Qaeda members, to use ostensible employment with

their organizations as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (6) serving as liaisons to localized terrorist organizations on behalf of Al Qaeda, thereby assisting Al Qaeda in expanding its operational base and sphere of influence; (7) funding and facilitating shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including Al Qaeda; (7) funding camps used by Al Qaeda and associated jihadist organizations to train soldiers and terrorists, including camps used to train the September 11th hijackers; (9) actively recruiting new members for Islamic terrorist organizations and associated separatist movements, including Al Qaeda; (10) working throughout the World to spread Al Qaeda's jihadist ideology and draw new adherents to its cause; (11) serving as channels for distributing information and documentation within Islamic terrorist organizations and associated separatist movements, including Al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (12) disseminating publications designed to advance Al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (13) openly advocating for Muslims to take up arms against Western and democratic societies, including the United States.

### B.  The Tortious Acts of the Saudi Government In Support of the September 11th Attacks

39.     In 1996, Al Qaeda began planning and developing the September 11th Attacks.

40.     During a meeting with bin Laden in Tora Bora, Afghanistan in 1996, Khalid Sheikh Mohammed ("Khalid Mohammed"), the mastermind behind the September 11th attacks, briefed bin Laden on his proposed operation.

41.     The initial plan for the September 11th Attacks  was an adaptation of a component

attack of the earlier "Bojinka" plot conceived by Khalid Mohammed and Ramzi Yousef ("Yousef") in 1994.  Yousef's successful attack on the World Trade Center in 1993 inspired Khalid Mohammed to begin planning attacks against the United States.

42.     In late 1998 or early 1999, bin Laden directed Khalid Mohammed to proceed with the operational planning for the September 11th attacks.  Bin Laden then personally selected several individuals to serve as suicide operatives, including Saudi nationals Nawaf al Hazmi ("Hazmi") and Khalid al Mihdhar ("Mihdhar")

43.     Hazmi and Mihdhar, were experienced Al Qaeda veterans described by the Director of the  Central Intelligence Agency (CIA) George Tenet as "having trained and fought under al Qa'ida auspices in three different countries." In 1995, Hazmi and Mihdhar traveled to Bosnia to participate in jihad with other Muslims and later traveled to Chechnya to fight with the Chechen rebels.

44.     Hazmi first traveled to Afghanistan as a teenager in 1993, returning to the country sometime before 1998 to swear allegiance to bin Laden. Hazmi fought against the Northern Alliance and returned to Saudi Arabia in early 1999.

45.     Mihdhar made his first trip to Afghanistan in early 1996 to attend Al Qaeda training camps. He returned in 1998 and also swore allegiance to bin Laden.

46.     In April 1999, Hazmi and Mihdhar obtained visas through the U.S. Consulate in Jeddah, Saudi Arabia. Soon thereafter, they traveled to Afghanistan to attend a training course at Al Qaeda's Mes Aynak camp which offered a full range of vigorous instruction to the future hijackers, including an advanced commando course.

47.     Following completion of their advanced training at Mes Aynak, Hazmi and others traveled to Karachi, Pakistan where they received basic instruction on western culture and travel

from Khalid Mohammed.  Mihdhar did not attend the training, instead traveling to Yemen.

48.     In early January 2000, Hazmi and Mihdhar flew to Kuala Lumpur, Malaysia to attend an Al Qaeda summit hosted by the leader of the Al Qaeda affiliate Jemaah Islamiyah in Asia, Hambali (a/k/a "Riduan Isamuddin"). The meetings took place over the course of several days in a condominium owned by Yazid Sufaat.  Sufaat was arrested by Malaysian police in December 2001 based on evidence that he had procured four tons of bomb material, ammonium nitrate, for an Indonesian jihadist cell.

49.     Approximately a dozen individuals attended the meetings, including Al Qaeda members Khalid Mohammed, Ramzi Binalshibh, Tawfiq bin Attash (a/k/a "Khallad"), and Abu Bara al Yemeni. Key operational details of the September 11th attacks were discussed at this summit and Hazmi and Mihdhar were directed to fly to the United States.

50.     Following the meetings, Hazmi and Mihdhar flew to Bangkok, Thailand where they boarded an American Airlines flight to the United States. On January 15, 2000, they arrived in Los Angeles, establishing themselves as the first of the future September 11th hijackers to arrive in the United States.

51.     As the 9/11 Commission noted the two hijackers were "ill prepared for a mission in the United States. Their only qualifications for this plot were their devotion to Usama Bin Ladin, their veteran service, and their ability to get valid U.S. visas. Neither had spent any time in the West, and neither spoke much, if any, English."

52.     The Commission concluded it was therefore "unlikely that Hazmi and Mihdhar – neither of whom, in contrast to the Hamburg group, had any prior exposure to life in the West – would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival."

11

53.     The support network that received Hazmi and Mihdhar upon their arrival in the

United States, and assisted them in settling in the United States and beginning their preparations

for the September 11th Attacks, included Saudi officials Fahad al Thumairy, Omar al Bayoumi,

and Osama Basnan.

**C.  Saudi Officials Aided and Abetted the 9/11 Hijackers in the United States**

54.     Bayoumi (a/k/a "Omar Ahmad Mustafa Al-Baioomi"), was an employee of the

Saudi Arabian government, and served as a Saudi intelligence agent responsible for monitoring

the activities of Saudi citizens in the United States.

55.     Bayoumi provided extensive and critical assistance to  hijackers Hazmi and

Mihdhar.  Bayoumi's material support and assistance enabled Hazmi and Mihdhar to establish

themselves in the United States and begin their operational preparations for the attacks.

56.     At all material times, Bayoumi was acting at the direction of the Saudi

government and elements of the Ministry of Islamic Affairs in particular, in providing material

support to the hijackers. As a top FBI official stated  "We [the FBI] firmly believed that he

[Bayoumi] had knowledge [of the 9/11 plot], and that his meeting with them [Hazmi and

Mihdhar] that day was more than coincidence."

57.     Bayoumi was an employee of the Saudi Arabian Presidency of Civil Aviation

("PCA"), a branch of the Saudi Ministry of Defense since the mid-1980's.  In August 1994,

Bayoumi moved to the United States at the direction of the Saudi government where he enrolled

in an ESL program (English as a Second Language) at San Diego State University ("SDSU").

58.     Bayoumi lived in the San Diego suburb with his wife, Manal Bajadr, and four

children. On his rental application for an apartment, Bayoumi listed his job as student and his

income as $2,800 a month, a stipend he claimed came from a family in India. But U.S.

intelligence reports confirm that Bayoumi's finances were supported by the government of Saudi Arabia itself.

59.     Bayoumi was well known throughout the San Diego Muslim community, spending much of his time interacting with all of the regional mosques, including the Islamic Center of San Diego ("ICSD").

60.     During his initial year in San Diego, Bayoumi was granted a secondment by the PCA to work as an employee of Dallah Avco Trans Arabia Company ("Dallah Avco") in Saudi Arabia.  Dallah Avco, an aviation contractor, is a wholly-owned subsidiary of the Dallah al Baraka Group ("DBG") which is owned by wealthy Saudi businessman, Saleh Abdullah Kamel. DBG and Kamel directed tens of millions of dollars in funding to support Al Qaeda and other radical Islamic causes. Kamel has been publicly identified on the "Golden Chain" as one of Al Qaeda's principal financiers.

61.     In or around 1995, Bayoumi began receiving a $3,000 monthly salary from Dallah Avco. Although the salary was given to Bayoumi as payment for his work on an aviation project commissioned by the Saudi government and taking place in the Kingdom, Bayoumi remained in San Diego and did not report for the job. Despite his absence, Bayoumi remained in the employment of Dallah Avco for the next seven years. The Saudi government reimbursed Dallah Avco for Bayoumi's salary. For its part, Dallah Avco has stated in ongoing discovery proceedings that Bayoumi was, at all time, an employee of the Saudi government. Further, Dallah Avco has asserted that virtually all documents in its possession concerning Bayoumi are "classified" materials under a Saudi Royal Decree prohibiting the dissemination by public employees of information "the disclosure of which [would] prejudice[ ] the State's national security, interests, policies or rights."

62.     After obtaining his degree from SDSU, Bayoumi continued to seek higher

education in the United States and submitted his application for an executive doctorate in the

Management Program at the Weatherhead School of Management at Case Western Reserve

University in Cleveland, Ohio. On his application, Bayoumi stated that he was employed by the

Saudi Civil Aviation Administration and was the "Assistant to the Director of Finance, Contracts

and Finance Control Division, PCA, Airways Engineering" of Dallah Avco.

63.     Thereafter, Bayoumi enrolled in a George Washington University program in

Project Management, which he pursued both in San Diego and Washington, D.C. While

attending classes in Washington, Bayoumi resided with an employee of the Saudi Embassy in

D.C.

64.     On September 8, 1998, the FBI's San Diego Field Office opened a preliminary

inquiry into Bayoumi based on allegations raised by the manager in the apartment complex

where he was living. According to the manager, she had been notified by the U.S. Postal

Inspection Service in March 1998 that a suspicious package had been sent to Bayoumi from the

Middle East. The package had broken open and a number of wires were protruding from it. The

manager also reported that a maintenance worker for the apartment complex had noticed strange

wires protruding beneath the bathroom sink in Bayoumi's master bedroom. The manager also

reported frequent gatherings of young Middle Eastern men at Bayoumi's apartment on weekend

nights.

65.     The FBI case agent conducted a limited investigation into Bayoumi but the

preliminary inquiry was closed on June 7, 1999 and Bayoumi was no longer actively investigated

by the FBI.

66.     In its pre-9/11 investigation, the FBI identified Bayoumi as an agent of the Saudi

14

government.

67.     On February 1, 2000, Bayoumi and Caysan bin Don (a/k/a "Isamu Dyson") got into Bayoumi's car and drove nearly two hours from San Diego to the Saudi Arabian Royal Consulate in Los Angeles. Bayoumi had previously disclosed to friends at the ICSD that he had friends at the Saudi Consulate.

68.     Upon arriving at the Saudi Consulate, Bayoumi met for an hour with an official from the Consulate's Ministry of Islamic Affairs office, Fahad al Thumairy ("Thumairy"). U.S. officials have concluded that Thumairy and Bayoumi discussed the recent arrival of future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar in the United States, and Bayoumi was tasked with getting them welcomed and assimilated into the San Diego Muslim community.

69.     Thumairy, who was twenty-nine years old at the time of the meeting with Bayoumi, graduated with a degree in Islamic studies from the Imam Muhammad Bin Saudi Islamic University in the Kingdom and immediately joined the Saudi Ministry of Islamic Affairs. The Ministry directed Thumairy to serve in the United States and he was sent to the Saudi Embassy in Washington, D.C. The Embassy then assigned Thumairy to the Saudi Consulate in Los Angeles. Thumairy does not recall the name of the individual that sent him to Los Angeles, but noted it was the person in charge of the Islamic Affairs office at the Embassy.

70.     Thumairy was an accredited diplomat at the Saudi Consulate from 1996 to 2003, and further served as a religious leader at the King Fahd Mosque in Culver City, CA, a mosque that had been built with financial assistance from the government of Saudi Arabia. As of January 2000, Thumairy acted as the Saudi Consulate's liaison to the King Fahd Mosque, per the request of his superiors at the Ministry of Islamic Affairs.

71.     After arriving in the United States on January 15th, Hazmi and Mihdhar reportedly

spent time at the King Fahd Mosque until their move to San Diego a few short weeks later.

72.    Thumairy was an Islamic fundamentalist who believed in strict adherence to the orthodox Wahhabi doctrine.   Muslims within the King Fahd Mosque expressed concerns regarding Thumairy's religious teachings, stating that he "injected non-Islamic themes into his guidance/prayers at the [King Fahd] Mosque" and further had followers "supportive of the events of September 11, 2001."

73.    Bayoumi specifically  identified Thumairy as the imam at the King Fahd Mosque and described him as his religious advisor.

74.    On February 23, 2004, 9/11 Commission members Dietrich Snell and Raj De interviewed Thumairy in Saudi Arabia. Also present at the interview as Major Khalid, a Saudi official with the Mabahith, the secret police agency of the Ministry of Interior. To their astonishment, when Thumairy was asked about his relationship with Bayoumi, he denied knowing Bayoumi:

> Al-Thumairy stated that he did not recognize the name Omar al-Bayoumi. When shown a photo of al-Bayoumi, al-Thumairy first denied recognizing him. At this time, Major Khalid whispered something to him in Arabic, and Thumairy said in English, "Oh Bayoumi." Al-Thumairy then acknowledged that he recognized al-Bayoumi because he had seen him on television, but denied ever seeing him in Los Angeles.

75.    9/11 Commission members Snell and De interviewed Thumairy again and reported:

> At this point, al-Thumairy was asked again about Omar al-Bayoumi. Al-Thumairy was reminded that at his interview the previous night, he had initially denied recognizing al-Bayoumi until Major Khalid said something to him, which was when he acknowledged recognizing al-Bayoumi from the media. Al-Thumairy was also informed that we have information that shows numerous phone calls between him and al-Bayoumi over a short period in December 1999, from both al-Thumairy's cell and landline phones. Finally, al-Thumairy was told that since speaking with him the prior night, we were told by another witness [i.e.

Khalil al-Khalil] that he had been seen meeting with al-Bayoumi on several occasions at the [King Fahd Mosque]. Despite being confronted with these facts, al-Thumairy continued to deny knowing al-Bayoumi.

76.     Bayoumi called Thumairy's home telephone over ten (10) times between December 1998 and December 200 and Thumairy called Bayoumi's cellular and home phone 11 times between December 3 and December 20, 2000.

77.     Given his apparent terrorist ties, the United States revoked Thumairy's diplomatic visa in May 2003, banning him from entering the United States again.

78.     Immediately following their stop at the Saudi Consulate, Bayoumi and bin Don drove to the King Fahd Mosque and later to a nearby Middle Eastern restaurant known as the Mediterranean Café, where they met with Hazmi and Mihdhar. Hazmi and Mihdhar explained to Bayoumi in Arabic that they had just arrived in the United States and were living in a nearby apartment.

79.     Bayoumi exchanged his telephone number with Hazmi and invited the men to relocate to San Diego. Following their meeting, Bayoumi and bin Don returned to the King Fahd Mosque for the evening prayer. Soon thereafter, Hazmi called Bayoumi to arrange for his and Mihdhar's relocation to San Diego, with Bayoumi's assistance.

80.     Hamzi and Mihdhar arrived in San Diego on February 4, 2000 and Bayoumi began undertaking efforts to get the future hijackers assimilated into the local Muslim community. This same day, four telephone calls were placed from Bayoumi's cell phone to Anwar Aulaqi, a senior Al Qaeda recruiter who was involved in planning terrorist operations for Al Qaeda and was killed by a United States drone attack on September 30, 2011 in Yemen. Additional calls from Bayoumi's cell phone to Aulaqi took place on February 10, 16, and 18.

81.     In an interview with 9/11 Commission members, Bayoumi admitted to having a relationship with Aulaqi, describing him as someone "with whom he discussed religious matters and ideas similar to those he would discuss with other imams."

82.     The two hijackers initially moved in with Bayoumi and his family at their residence at the Parkwood Apartment complex, 6333 Mount Ada Road, Apt. #152, San Diego, CA 92111, until Bayoumi was able to secure similar housing for them at the same apartment building (Apt. #150) a few days later.

83.     Public records indicate that Suleiman al Ali, a member of the Saudi Ulema who served as an official of the IIRO's branch office in the United States and its financial arm Sana-Bell, Inc., maintained a shared address with Bayoumi from October 1999-Janaury 2000, just prior to the arrival of Hazmi and Mihdhar. According to U.S. intelligence documents, Ali maintained longstanding relationships with Islamic radicals and terror groups, and was implicated in the diversion of IIRO funds for the 1998 U.S. Embassy bombings.

84.     Bayoumi recommended Hazmi and Mihdhar to the property manager of the Parkwood Apartments and appears as co-signer and guarantor for them on their rental application. Bayoumi is further listed as the co-signor and guarantor on their lease agreement because they did not have established credit. When the real estate agent refused to take cash for a deposit on the apartment, Bayoumi helped Hazmi and Mihdhar open a bank account with a $9,000 deposit. According to the manager at the Parkwood Apartments, Bayoumi would occasionally pay the hijackers' rent.

85.     Future 9/11 hijacker Hani Hanjour was also seen in Bayoumi's apartment at least twice in early 2000 according to witnesses.

86.     After Hazmi and Mihdhar moved into their own apartment at the Parkwood Apartments, Bayoumi organized a party to welcome the two men to San Diego. The party was attended by approximately 20 men from the local Muslim community, including members of the ICSD. Cayson bin Don attended the party and used Bayoumi's video camera to videotape the party. According to bin Don, Hamzi and Mihdhar mingled with the attendees, explaining that they were students.

87.     By all accounts, the party was successful in welcoming and introducing Hazmi and Mihdhar to the San Diego Muslim community, and the 9/11 hijackers would soon form trusted relationships with other key Muslims in the area as a result of Bayoumi's efforts.

88.     Despite Bayoumi's modest income and student status, witnesses reported that Bayoumi had access to "seemingly endless" funds while in the United States, serving as a conduit for large sums of money from Saudi Arabia to the United States. In 1998, a FBI source identified Bayoumi as the individual who delivered approximately $400,000 from Saudi philanthropist Saed al Habib (a/k/a Mohamed Barak) for the construction of a Kurdish mosque in in El Cajon, CA, approximately 15 miles northeast of San Diego.

89.     The substantial donation was made on the condition that the Al Medina Al Munawara Mosque hire Bayoumi as the building manager and provide him with a private office. Following completion of the mosque, however, the mosque's leadership became unhappy with Bayoumi due to his failure to show up for work and the discovery of financial irregularities relating to his collection and distribution of funds.

90.     The Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001 ("9/11 Joint Inquiry Report"), authored by the United States House Permanent Select Committee

on Intelligence and the Senate Select Committee on Intelligence, similarly concluded that Bayoumi "had access to seemingly unlimited funding from Saudi Arabia."

91.     Bayoumi's primary source of income originating from Saudi Arabia came from his employment with Dallah Avco. Although the project for which Bayoumi was allegedly hired was based in the Kingdom, Bayoumi showed up for work only once during the seven years he was receiving a salary from Dallah Avco. Bayoumi's chronic absence led employees at the company to describe him as a "ghost employee," one of many Saudis on the payroll who were not required to work. According to U.S. intelligence, there were approximately fifty (50) individuals who were being carried on the books at Dallah Avco who were being paid for doing nothing.

92.     Dallah Avco records indicate that, in or around April 1999, Dallah Avco sought to terminate Bayoumi's annual employment contract. To that end, a Dallah Avco official wrote to the PCA advising that "the company is not willing to renew the period for another year and we wish this to be known." A PCA official immediately responded with an "extremely urgent" letter informing Dallah Avco that the Saudi government wanted Bayoumi's contract renewed "as quickly as possible." According to FBI documentation, Bayoumi "was a representative that PCA personnel wished to keep in America." From his "ghost job," Bayoumi was receiving a monthly salary of about $3,000 with allowances of $465 per month.

93.     In or around March 2000, Dallah Avco awarded Bayoumi with a promotion, raised his salary, and further increased his "other allowances" stipend from approximately $465 to $3,925 a month, remaining at that level until December 2000.In January 2001, the stipend was reduced to $3,427.

94.    One of the FBI's best sources in San Diego informed the FBI that he thought that al-Bayoumi must be an intelligence officer for Saudi Arabia or another foreign power.

95.    A number of witnesses in San Diego believed that Bayoumi was closely connected to the Saudi government and likely working as an intelligence agent. One witness, noting that Bayoumi did not work while in the United States, stated that he "had more money than he knew what to do with." Another witness told the FBI that Bayoumi "always had a significant source or supply of money and observed him driving a new Toyota."

96.    A U.S. intelligence document titled "Connections of San Diego PENTTBOMB Subjects to the Government of Saudi Arabia," details a prevailing feeling within the San Diego Muslim community that Bayoumi was more than he seemed:

4. <u>Witness Reports</u>: Various SD witnesses have described Al-Bayoumi as "associated with the Saudi government" [REDACTED]; "a frequent traveler to Saudi Arabia" [REDACTED]; "member of the Aviation Board for Saudi Arabia" [REDACTED]; "having regular contact with the Saudi Arabian Consulate in LA" [REDACTED]; "making frequent trips to the Saudi Consulate during the six years he was known to live in San Diego" [REDACTED]; "working for the Saudi government to watch the actions of Saudis in the U.S." [REDACTED]; inquiring about the welfare of Saudi students in San Diego [REDACTED]; "on a scholarship and financially supported by the Saudi government" [REDACTED]; "having friends at the Saudi Consulate in LA" [REDACTED]; "a spy for the Saudi government" (hijacker Al-Hazmi as reported by Shaikh); "receiving support from the Saudi Arabian Government or Saudi Airlines" [REDACTED]; a reputed "Saudi Arabian intelligence officer" due to his prolific videotaping of services at the mosque (Abukar); "an engineer for the Saudi Arabian government" [REDACTED]; "providing a $500 check to the SD Kurdish Community Islamic Center drawn on the account of the Royal Embassy of Saudi Arabia [REDACTED]; considered by some in the community as "some type of intelligence agent for the Saudi Arabian government [REDACTED] "frequently traveling to the Los Angeles airport to drop off or pick up Saudis visiting southern California" [REDACTED] traveling to WDC every one to two months" to visit the civil aviation office of the Saudi Consulate on Wyoming Street in WDC [REDACTED] "disclosing to others at the Islamic Center that he has friends/contacts in the Saudi Consulate in LA" [REDACTED], a "ghost employee" of Dallah/Avco and one of "approximately 50 individuals carried on the books of Dallah and being paid for doing nothing" [REDACTED] "working for the Saudi Intelligence Service to report on dissident Saudis" [REDACTED].

97.     Former Senator Bob Graham, who in his role as the Chairman of the Senate Select Committee on Intelligence, and who also served as the Co-Chair of the Congressional Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 ("9/11 Joint Inquiry"), similarly concluded in affidavit testimony that Bayoumi was an agent of the Saudi government, and that Bayoumi was acting at the direction of elements of the Saudi government in providing support to the September 11th hijackers. Senator Graham testified as follows:

> Based on my experiences as Co-Chair of the Joint Inquiry, and the evidence collected by the Joint Inquiry during the course of its investigation into the events of September 11, 2001, the information contained in the Final Report of the 9/11 Commission, and reports and published materials I have reviewed, I am convinced there was a direct line between at least some of the terrorists who carried out the September 11th attacks and the government of Saudi Arabia, and that a Saudi government agent living in the United States, Omar al Bayoumi, provided direct assistance to the September 11th hijackers Nawaf al Hazmi and Khalid al Mihdhar. Based on the evidence discovered by the Joint Inquiry, I further believe that al Bayoumi was acting at the direction of elements of the Saudi government and that an official from the Islamic and Cultural Affairs section of the Saudi Consulate in Los Angeles, Fahad al Thumairy, likely played some role in the support network for the 9/11 attacks. In May 2003, the United States revoked al Thumairy's diplomatic visa and banned him from the United States.

98.     The 9/11 Commission's investigation confirms that the staff members responsible for conducting the inquiry into Bayoumi's role in the attacks "felt strongly that they had demonstrated a close Saudi government connection to the two hijackers in San Diego," but that political considerations led to the omission of that conclusion from the 9/11 Commission's Final Report. Philip Shenon, *The Commission: The Uncensored History of the 9/11 Investigation*, pp. 398-99 (2008).

99.     9/11 Commissioner John Lehman also expressed his view that "it was clear early on that there was some sort of Saudi support network in San Diego that had made it possible for the hijackers to hide in plain sight." *Id.* at p. 185.

100.    Intelligence collected by the FBI demonstrates a deeply rooted relationship between the Saudi government and Bayoumi. According to an April 5, 2002 FBI report titled "Omar Al Bayoumi, Employed by Dallah Al Baraka," the FBI obtained and analyzed Bayoumi's telephone records revealing extensive contacts between Bayoumi and Saudi officials in Washington D.C. and Los Angeles particularly during the January-March 2000 timeframe when 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles and subsequently settled in San Diego with Bayoumi's assistance.

101.    Telephone records indicate that Bayoumi made approximately 141 calls to Saudi officials in Washington D.C. at the Saudi Arabian Royal Embassy, the Saudi Islamic Affairs Department, the Saudi Arabian Cultural Mission, the Saudi Arabian Education Mission, and the Saudi National Guard. Bayoumi also made approximately 34 calls to the Saudi Arabian Royal Consulate in Los Angeles.

102.    The extent and pattern of these contacts are consistent with witness statements identifying Bayoumi as an agent of the Saudi government responsible for monitoring the activities of Saudi citizens living in the United States, a role in which he would have reported to the Islamic Affairs departments in the Kingdom's embassies and consulates.

103.    Moreover, the U.S. Postal Service advised the FBI that on January 18, 2001, Bayoumi received a package at his San Diego apartment from the Saudi Arabian Royal Embassy, 601 New Hampshire Ave., N.W., Washington, D.C.

104.    Evidence further indicates that an additional source of Saudi government funding used to support the activities of Hazmi and Mihdhar while in the United States came by way of Bayoumi's relationship with Osama Yousef Basnan, another agent of the Saudi government.

105.    Basnan, known as a vocal Al Qaeda sympathizer and further described by U.S. intelligence as an "ardent UBL [Osama bin Laden] supporter" who "has been in contact with UBL family members," was a target of FBI investigations as early as 1992.

106.    In May of that year, the State Department provided the FBI with a box of documents recovered from a parked car that was abandoned on Wisconsin Avenue near the residence of then Secretary of State, James A. Baker. The car, belonging to Basnan's used car business in Alexandria, VA, had been parked there by Basnan while allegedly visiting a friend's nearby clothing business. The documents, consisting of jihadist literature, included a "Confidential" newsletter written in Arabic to supporters of the Eritrean Islamic Jihad (EIJ) Movement, providing updates on the EIJ's council. A high level EIJ member reportedly sat on Al Qaeda's Shura Council. The documents also included a number of letters addressed to Basnan outlining plans to import used cars to the United States.

107.    That same year, on October 17, 1992, Basnan hosted a party in Washington D.C. for Omar Abdul Rahman (a/k/a the "Blind Sheikh") who is currently serving a life sentence following his conviction for his role in supporting the 1993 World Trade Center bombing and for plotting a "day of terror" in which he planned to attack the United Nations in New York City, bomb the Holland and Lincoln tunnels, and assassinate then-Senator Alfonse D'Amato.

108.    FBI sources further report that in September 2000, Basnan was in phone and e-mail contact with senior Al Qaeda member and key facilitator for the September 11th attacks, Ramzi Binalshibh. Binalshibh himself confirmed his relationship with Basnan during interrogations by U.S. officials following his capture in Karachi, Pakistan on September 11, 2002.

109.     According to U.S. intelligence reports, Basnan's wife, Majeda Ibrahin Dweikat, reportedly required thyroid surgery in April 1998. Basnan contacted the health attaché at the Saudi Embassy in Washington D.C., requesting financial assistance for the surgery on his wife's behalf. Soon thereafter, Basnan received a $15,000 check from the Saudi Embassy to pay for the surgery. That amount was apparently insufficient to cover the cost of her treatments and Basnan's wife submitted her own request to Princess Haifa al Faisal, the wife of Prince Bandar bin Sultan bin Abdul Aziz al Saud, the Saudi Ambassador to the United States.

110.     Basnan's wife was placed on Princess Haifa's charity list in January 1999, and began receiving cashier's checks totaling between $2,000 and $3,000 a month. At the same time that Hazmi and Mihdhar arrived in the United States in January 2000, Basnan's wife began signing her checks over to Bayoumi's wife, Manal Bajadr. According to Senator Graham: "Beginning in 2000, Basnan's wife began signing her checks over to a woman named Manal Bajadr – the wife of Omar al Bayoumi. It looked suspiciously like another backdoor way of channeling money to al-Hazmi and al-Mihdhar. This would also justify Bassan's boast to the FBI that he had done more for the two future hijackers than had al-Bayoumi." Senator Bob Graham, *Intelligence Matters*, p. 168 (2004). The payments, drawn from Princess Haifa's account at Riggs Bank in Washington D.C., total nearly $150,000.

111.     9/11 Commissioner John Lehman believed that Princess Haifa had no knowledge that the money would end up in the hands of the hijackers, but was simply signing checks that had been placed in front of her by Wahhabi radicals who worked out of the Ministry of Islamic Affairs office in the Saudi Embassy. According to Lehman, "it was well-known in intelligence circles that the Islamic Affairs office functioned as the Saudis' 'fifth column' in support of

Muslim extremists." Philip Shenon, *The Commission: The Uncensored History of the 9/11 Investigation*, p. 185 (2008).

112.    Basnan remained in San Diego through the September 11th attacks and "celebrated the heroes of September 11" and talked about "what a wonderful, glorious day it had been" at a party shortly thereafter. In August 2002, Basnan and his wife were arrested for visa fraud, ultimately admitting they used false immigration documents to remain in the United States. Basnan was deported to Saudi Arabia on November 17, 2002. His wife was deported to Jordan the same day.

113.    FBI witness testimony confirms that Bayoumi and Basna were "the closest of friends." Both Bayoumi and Basnan were well known at the ICSD and their families both lived at the Parkwood Apartments at the same time Hazmi and Mihdhar resided there in 2000. Additionally, their wives were arrested together in April 2001 for shoplifting at a J.C. Penney.

114.    An FBI agent assigned to a counter-terrorism squad investigating Basnan confirmed that "phone records reveal roughly 700 calls between various phones subscribed to by Bayoumi and Basnan over a one year period."

115.    Witness testimony further confirms that Basnan had close ties to other persons connected to the hijackers, and made a number of in-person visits to the Saudi Consulate in Los Angeles. According to an October 3, 2001 FBI report titled "PENTTBOMB; MAJOR CASE 192," Basnan also had telephone contact with Anwar Aulaqi.

116.    9/11 Commission member Dietrich L. Snell, who conducted the October 2003 interview of Basnan in Riyadh, Saudi Arabia with representatives of the Mabahith in attendance, noted the deceitful and misleading nature of Basnan's testimony:

The interview failed to yield any new information of note. Instead, in the writer's opinion, it established beyond cavil the witness' utter lack of credibility on virtually every material subject. This assessment is based on: the witness' demeanor, which engendered a combination of confrontation, evasiveness, and speechmaking, presumably for the benefit of his Mabahith audience; his repudiation of statements made by him on prior occasions; and the inherent incredibility of many of his assertions when viewed in light of the totality of the available evidence.

117.    In addition to being the point person to facilitate the future hijackers' preparations in the United States, Bayoumi was responsible for introducing Hazmi and Mihdhar to certain members of the San Diego Muslim community that not only shared their extremist beliefs and hatred for the United States, but would also provide significant logistical and ideological support to the hijackers as they plotted the attacks.

118.    One such individual was Anwar Aulaqi. Aulaqi, who was covertly acting as a senior recruiter for Al Qaeda and affiliated terrorist organizations and advocating jihad against the United States, had spent nearly five years in the public eye as the imam of the Al Ribat Al Islami Mosque (or "Rabat") in La Mesa, CA, northeast of San Diego. Aulaqi had a following of approximately 200-300 people and would become an important religious leader to Hazmi and Mihdhar.

119.    Aulaqi has been linked to Fort Hood shooter Nidal Malik Hasan, as well as Christmas Day bomber Umar Farouk Abdulmutallab. According to U.S. intelligence, Aulaqi was one of Abdulmutallab's Al Qaeda trainers who assisted in planning the attack and providing religious justification for it. Moreover, Faisal Shahzad, the individual responsible for the failed New York Times Square car bombing attempt on May 1, 2010, told U.S. investigators that he was inspired by Aulaqi.

120.    Aulaqi was also the subject of FBI investigations in 1999 and 2000 after learning that he may have been contacted by a "possible procurement agent" for Osama bin Laden. During the investigation, the FBI learned that Aulaqi knew individuals with the Holy Land Foundation and others involved in raising money for Hamas.

121.    Aulaqi had other extremist connections. U.S. intelligence reports link Aulaqi to other FBI counter-terrorism investigations, including the activities of "the Palestinian Islamic Jihad (PIJ) in the United Sates." Moreover, according to the Joint Inquiry Report, Aulaqi was visited in early 2000 "by a subject of a Los Angeles investigation closely associated with Blind Sheikh [Omar Abdel] al-Rahman." The FBI closed its inquiry into Aulaqi's activities in March 2000, two months after Hazmi and Mihdhar arrived in San Diego, claiming that the evidence collected by the agency was not considered strong enough to support a criminal prosecution at the time.

122.    Aulaqi, Hazmi, and Mihdhar developed a close relationship and FBI sources reported that "Aulaqi met consistently and privately with Alhazmi and Almidhdir for prayers." Another witness recalled meeting Hazmi through Aulaqi and Mohdar Abdullah, and later meeting Mihdhar at Aulaqi's mosque. The witness also remembered seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting. Other witnesses "informed the FBI after September 11 that [Aulaqi] had closed-door meetings in San Diego with al-Mihdhar, al-Hazmi, and another individual, whom al-Bayoumi had asked to help the hijackers."

123.    These contacts have led investigators, including Senator Graham, to conclude that Aulaqi was not only Hazmi's and Mihdhar's spiritual leader but also a trusted confidant who was fully aware of the planned 9/11 attacks.

124.    Aulaqi eventually left San Diego in mid-2000, and by January 2001 had relocated to Virginia where he took a position at the Dar al Hijra Mosque at 3159 Row Street, Falls Church, VA 22044.  He resided at 3331 Kaywood Drive, Falls Church, VA 22041.

125.    Hamzi and 9/11 hijacker Hani Hanjour arrived at Dar al Hijra in early April 2001. Upon their arrival, Aulaqi tasked a Jordanian named Eyad al Rababah to assist the hijackers get settled and find an apartment. They eventually moved into Rababah's friend's apartment in Alexandria, VA. On May 8, 2001, Rababah went back to the apartment to pick up Hazmi and Hanjour for a trip to Connecticut. When Rababah arrived at the apartment, he found they had new roommates – muscle hijackers Ahmed al Ghamdi (United Airlines Flight 175) and Majed Moqed (American Airlines Flight 77).

126.    Following the September 11th attacks, Aulaqi submitted to four FBI interviews between September 15 and 19, 2001. During an interview on September 17, the FBI showed Aulaqi a picture of the American Airlines Flight 77 hijackers. Aulaqi stated that he knew Hazmi from the Al Ribat Al Islami Mosque in San Diego, provided a physical description of him, and further described some of his personality traits, explaining that Hazmi was "a loner who did not have a large circle of friends," "was slow to enter into personal relationships," and "was always very soft spoken, a very calm and extremely nice person." Although Aulaqi admitted meeting with Hazmi several times, he claimed not to remember any specifics of what they discussed.

127.    Aulaqi told the FBI that he did not recognize Mihdhar, but did admit to knowing Hani Hanjour. According to the FBI, information in their possession at the time of the interviews suggested "a more pervasive connection" between Aulaqi and the 9/11 hijackers than he was willing to admit.

128.    Bayoumi was also responsible for introducing Hazmi and Mihdhar to Mohdhar Mohamed Abdullah (a/k/a "Mihdar Mohammad al Mihdar Zaid"). Abdullah, who was a friend to both Bayoumi and Aulaqi, lived in an apartment complex around the corner from Aulaqi's mosque. According to the 9/11 Commission, in a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically asked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, CA."

129.    Per Bayoumi's instructions, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translating between English and Arabic. Abdullah also helped Hazmi and Mihdhar obtain fake driver's licenses with false names from an unknown individual in Los Angeles. Abdullah drove the hijackers from San Diego to an area in Los Angeles, near McArthur Park, and a second location near Huntington Park, where the unknown individual was selling the fake cards. Abdullah purchased approximately four or five fraudulent California Department of Motor Vehicle identification cards and gave them to Hazmi and Mihdhar.

130.    Abdullah further helped Hazmi conduct surveillance of the Los Angeles International Airport in June 2000. On June 9, the day before Mihdhar left the United States and returned to Yemen to visit his family, Abdullah traveled with Hamzi and Mihdhar to Los Angeles where they visited the King Fahd Mosque. Abdullah was surprised that the hijackers already knew several people at the mosque, including an individual named Khallam. FBI investigators believe the individual is Khallad bin Attash, an Al Qaeda operative and trusted member of Osama bin Laden's inner circle who is linked to the 1998 U.S. Embassy bombings and the purported mastermind behind the U.S.S. Cole bombing. Their belief is based on witness

reporting that Khallad was in the United States that same month and was seen in the company of Fahad al Thumairy.

131.    During a number of interviews with the FBI following the 9/11 attacks, Abdullah reportedly admitted knowing of Mihdhar's and Hazmi's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden, an Islamic extremist group in Yemen with ties to Al Qaeda. According to the 9/11 Commission, Abdullah was clearly sympathetic to those extremist views and expressed hatred for the U.S. government.

132.    Abdullah bragged to fellow inmates in September-October 2003 (during his incarceration for immigration charges), that he knew that Hazmi and Mihdhar intended to carry out a terrorist attack in the United States. Abdullah told the inmates that he first learned of the terrorist plot from Hazmi and Mihdhar themselves during a dinner at a restaurant in San Diego after praying together at a nearby mosque. Hazmi and Mihdhar invited Abdullah to join them on the airplane and participate in the attack. Abdullah knew that the attack would consist of an airplane flying into a building, but Abdullah reportedly did not know any further details.

133.    Abdullah further boasted that he was responsible for driving Hazmi and Mihdhar from Los Angeles to San Diego after meeting Bayoumi in the Mediterranean Café with Cayson bin Don.

134.    After spending nearly 3 years in U.S. prisons, and multiple challenges to deportation proceedings arising from immigration violations, Abdullah was deported to Yemen on May 21, 2004.

135.    While residing in San Diego in 2000, Mihdhar and Hazmi drew little attention to themselves. They enrolled in English language classes at the Language Instruction Centrum, took flying lessons at the National Air College and Sorbi Flying School in San Diego, opened a new

bank account at Bank of America with a $4,900 deposit, bought a 1988 Toyota Corolla for $2,300 and purchased automotive insurance, and obtained local phone service that included Hazmi's listing in the local telephone directory.

136.     On March 20, 2000, a long distance telephone call was placed from Mihdhar and Hazmi's apartment to a suspected terrorist facility in the Middle East linked to Al Qaeda activities.

137.     In May 2000, disappointed with their housing arrangements at the Parkwood Apartments, Hazmi and Mihdhar vacated their apartment and moved to a home at 8451 Mount Vernon Avenue, Lemon Grove, CA, which they had found through an advertisement at the ICSD.

138.     Mihdhar stayed at the Lemon Grove residence until June 10, 2000, when he left the United States for Yemen. Hazmi continued to reside at the house and remained in the San Diego area until he moved to Phoenix, Arizona with fellow hijacker Hani Hanjour on December 10, 2000, and then eventually the east coast.

139.     According to the records at the Parkwood Apartments, Bayoumi and his family moved out of their apartment just prior to the attacks on June 23, 2001. Bayoumi advised he was leaving the United States, but left no forwarding address with the property management company.

140.     In their final hours before boarding American Airlines Flight 77, overtaking the crew, and crashing the plane into the Pentagon, September 11th hijackers Hazmi, Mihdhar, and Hanjour, again found themselves in close proximity to a senior member of the Kingdom's Ulema, council of senior scholars, Saleh Ibn Abdul Rahman Hussayen.

141.    Hussayen, a member of the Saudi Ulema, had maintained a long career as a government official for the Kingdom, holding positions with the Ministry of Finance and National Economy, the Council of Prime Ministers, the MWL Constituent Council, and other appointed positions within the Saudi government.

142.    Hussayen also spent five years as a member of Al Rajhi Bank's Sharia Board, the committee at the bank charged with ensuring compliance with Islamic law, and ultimately responsible for approving Al Rajhi Bank's own zakat contributions, including those Al Rajhi Bank channeled to Al Qaeda through the IIRO.

143.    In the weeks prior to the attacks, Hussayen was in the United States on a fundraising mission with members of the Islamic Association of North America ("IANA"), a radical Islamic organization in Ypsilanti, Michigan which receives money from the Saudi government and other Saudi donors. The IANA has promoted teachings and fatwas issued by radical Saudi clerics Safar Hawali and Salman Ouda, which advocate violence against the United States. Hawali and Ouda were identified in the 1993 World Trade Center bombing trial as spiritual advisors to Osama bin Laden.

144.    Hussayen's nephew, Sami Omar al Hussayen, was employed by the IANA to create and maintain websites and other internet media which were used to recruit personnel and raise funds for violent jihad. From March 1995 until February 2002, the IANA received $3 million from Sami's resources, including two checks from his uncle totaling $100,000. In March 2004, Sami was charged with conspiracy to provide material support to Hamas and other violent jihadists through his work at the IANA and the Al Haramain Islamic Foundation.

145.    During this fundraising trip, Hussayen was scheduled to visit officials at the offices of the MWL and WAMY in the Washington, D.C. area. The WAMY office was headed at that time by Abdullah bin Laden.

146.    On September 6, 2001, Hussayen arrived in Herndon, VA. Then, just days before the September 11th attacks, Hussayen abruptly moved from his original hotel to the Marriott Residence Inn just a few miles away. The Marriott Residence Inn is the same hotel where September 11th hijackers Hazmi, Mihdhar, and Hanjour were staying before they woke up on the morning of September 11th, hijacked American Airlines Flight 77 and crashed it into the Pentagon killing approximately 125 military personnel and civilians, and injuring countless others.

147.    Directly after the attacks, FBI agents attempted to interview Hussayen in his hotel room. However, according to the FBI, Hussayen "feigned a seizure, prompting the agents to take him to a hospital, where the attending physicians found nothing wrong with him." The FBI returned to his hotel room the next day, but found Hussayen unwilling to cooperate.

148.    In March 2002, just months after the September 11th attacks, King Fahd bin Adbul Aziz al Saud appointed Hussayen as the President of the Committee of the Two Holy Mosques in Mecca and Medina, the two most sacred sites in Islam. Hussayen has since died.

149.    From the moment they first set foot in the United States on January 15, 2000, to the end of their journey almost two years later in a hotel with a senior member of the Saudi Ulema, Hazmi, Mihdhar and Hanjour were the benefactors of a broad support network orchestrated by agents of the Kingdom of Saudi Arabia, who helped provide them with the necessary tools to plot, prepare for, and ultimately conduct the September 11, 2001 terrorist attacks.

150.    Absent the critical financial, logistical, ideological and other support provided to them by Omar al Bayoumi, Fahad al Thumairy, Osama Basnan, Anwar Aulaqi, Mohdhar Abdullah, and others, the hijackers would have been incapable of successfully carrying out the single worst enemy attack on United States soil this country had seen in 60 years.

### D.  Material Support Through the Hamburg Cell

151.    The Saudi Ministry of Islamic Affairs also provided material support "Hamburg cell" through Muhammad Jaber Hassan Fahiki., the head of the Ministry of Islamic Affairs office in the Saudi Arabian Embassy in Berlin, Germany.

152.    The "Hamburg cell" consisted of key operatives in the September 11th attacks, including Mohammad Atta (the ringleader of the 19 hijackers who piloted American Airlines Flight 11), Marwan al Shehhi (piloted United Airlines Flight 175), Ziad Jarrah (piloted United Airlines Flight 93), Ramzi Binalshibh, Mounir el Motassadeq, Said Bahaji, Zakariya Essabar, Abdelghani Mzoudi, and others.

153.    Fakihi, who worked for the Ministry of Islamic Affairs in Riyadh following his graduation from the King Saud University in 1995, was assigned to head the Islamic Affairs office at the Saudi Embassy in Berlin in or around June 2000. Fakihi answered directly to the Saudi Minister of Islamic Affairs in Riyadh, Saleh bin Abdulaziz al Ashaikh.

154.    As a representative of the Saudi Embassy and Ministry of Islamic Affairs, Fakihi frequently attended the Al Nur Mosque in Berlin. The mosque was a notorious haven for Islamic extremists, often hosting Muslim clerics that preached intolerance of non-Muslims and justified violence in the name of defending Islam. Dr. Salem Rafei, a Lebanese cleric who ran the mosque, openly supported Palestinian suicide attacks and called Muslims to kill all unbelievers standing in the way of Islam. Documents containing the mosque's address were seized from

individuals detained by Pakistani authorities who are alleged to have received military training at Al Qaeda camps in Afghanistan in 2001.

155.     Fakihi, himself an adherent to the most extreme teachings of Wahhabi ideology, advocated for the development of mosques across Europe and told his superiors in the Kingdom that his ultimate goal was to turn Berlin into an Islamic center for Eastern Europe. In June 2000, Fakihi wrote a letter to the Saudi Minister of Islamic Affairs, Saleh bin Abdulaziz al Ashaikh, proposing to turn the Al Nur Mosque into a center for Islamic missionary activity aimed at "ethnic European" populations in Eastern Europe. Fakihi, who planned to move his office to the Al Nur Mosque, proposed to carry the word of Islam to Poland, the Czech Republic and Hungary, the last of "which once belonged to the Islamic Caliphate under Ottoman Empire rule."

156.     Fakihi arranged for Saudi charities to fund the expansion of the Al Nur Mosque consistent with his vision. In particular, the Saudi-based Al Haramain Islamic Foundation, a purported charity that was itself headed by the Saudi Minister of Islamic Affairs, donated $1.2 million to help the mosque purchase a newer, larger building outfitted with prayer rugs, classrooms, kitchens, shops, and an Internet server. According to municipal records in Berlin, Aqeel al Aqeel, Al Haramain's Director-General, was one of the building's owners. Aqeel was designated by the U.S. Treasury Department as a Specially Designated Global Terrorist ("SDGT") in June 2004. According to the Treasury Department, the Al Haramain Islamic Foundation provided "financial and material support to the al Qaida network" while under Aqeel's leadership.

157.     Mohammad Atta and other members of the Hamburg cell, including Mounir el Motassadeq, were seen visiting the mosque and meeting with Fakihi. Fakihi's business card was found in the apartment of Motassadeq, who was later arrested and convicted in a German court

for being an accessory to murder relative to the September 11th attacks, given his membership in the Hamburg cell and his knowledge and involvement in the preparation of the plans to hijack the planes.

158.     Fakihi further used the Al Nur Mosque to meet with other Al Qaeda members and Islamic extremists. In March 2003, German police raided a suspected terrorist cell in Berlin and arrested a half-dozen men who were planning a large scale terrorist attack in Germany. Bomb-making equipment, forged passports, flight-simulator software, chemicals and a handbook for brewing poisons were seized during the raid. German police said Fakihi met frequently at the Al Nur Mosque with the terror cell's leader, Ihsan Garnaoui, a Tunisian Al Qaeda member.

159.     Two days after the arrests, on March 22, 2003, the German Foreign Ministry, following a recommendation from the country's domestic-intelligence service, told the Saudi Embassy that Fakihi's diplomatic accreditation would be withdrawn unless he left the country. Four days later, Fakihi flew back to Saudi Arabia.

160.     Amid concerns that Fakihi may have funneled hundreds of thousands of dollars out of official Saudi Embassy accounts to Al Qaeda operatives in Europe, Saudi investigators interrogated him upon his return to the Kingdom.

161.     Fakihi confessed to his interrogators that he in fact transferred Saudi Embassy funds to certain charities, mosques and other recipients per the instructions he received from Al Qaeda loyalists and "close friends" of Osama bin Laden. U.S. officials' familiar with the Saudi investigation claim that Fakihi was "more than just a sympathizer of bin Laden" and was "organizationally involved" with bin Laden's Al Qaeda network. Saudi investigators reportedly reviewed some $800,000 in funds that were doled out by the Saudi Embassy's Ministry of Islamic Affairs office while under Fakihi's leadership.

162.     Saudi authorities nevertheless obstructed the German government's investigation into links between Fakihi and the members of the Hamburg cell. The Saudi Embassy in Berlin never responded to a formal request from German prosecutors to explain the presence of Fakihi's business card in Motassadeq's apartment or an alleged meeting between Fakihi and Motassadeq in Berlin shortly before the Al Qaeda member's arrest in November 2001.  In an interview with the Wall Street Journal in 2003, a German police official stated that the Saudi Embassy failed to cooperate in the probe.

163.     9/11 Commission member Snell conducted an interview with Fakihi in October 2003 in Riyadh relative to his duties with the Ministry of Islamic Affairs, his association with the Al Nur Mosque, and his relationships with Motassadeq and Garnaoui. According to Snell, Fakihi's testimony "did not appear credible."

164.     As further evidence of the depth of the Ministry of Islamic Affairs' ties to terrorist movements, including Al Qaeda, came to light in the wake of the September 11th Attacks, the United States and other governments directly targeted the Ministry and officials of the Ministry in a series of counter-terrorism initiatives.

165.     In December 2003, the State Department deported and revoked the visas of approximately sixteen (16) individuals who were using their diplomatic status as representatives of the Saudi Embassy in Washington D.C. to promote and spread the radical and extremist Wahhabi ideology in the United States.

166.     The group included Jaafar Idris, an influential cleric who worked out of the Ministry of Islamic Affairs office in the Saudi Embassy, who from his position at the Embassy worked extensively with Fairfax, VA-based Institute for Islamic and Arabic Sciences in America ("IIAS"), to promote extremist Wahhabi propaganda via student lectures and textbooks.

167.    IIAS, fully funded by the Saudi government, was operating as a satellite campus of the Al Imam Muhammad Ibn Saud Islamic University in Riyadh. Saudi Ambassador Prince Bandar bin Sultan bin Abdul Aziz al Saud acted as the Chairman of IIAS's Board of Trustees.

168.    Idris, who was well-known in Islamic radical circles, was president of American Open University in Alexandria, VA, and further founded the Islamic Foundation of America in Springfield, VA, which operated a school, a mosque, and a prison-outreach program. According to U.S. government sources, the Foundation's office was regularly visited by celebrated Islamic extremists, including Siraj Wahhaj, a New York imam who was identified as an unindicted conspirator in the 1993 World Trade Center bombing.

169.    The State Department's actions coincided with investigations conducted by the Internal Revenue Service and Senate Finance Committee into IIAS and its links to terrorist groups, forcing the Saudi government to end its sponsorship of the school.

170.    In a January 29, 2004 letter to then Secretary of State Colin L. Powell, Senator Charles Schumer urged the State Department to follow up its decision to revoke the visas of the Saudi officials and increase pressure on the Saudi government "to shut down the Islamic Affairs sections at their American diplomatic posts and to cease funding the Institute for Islamic and Arabic Sciences (IIAS)." According to Senator Schumer, "the Saudis continue to sponsor and promote the spread of religious extremism in the U.S.," particularly the Islamic Affairs offices which "supply textbooks to Muslim schools in the U.S. that promote an intolerant Wahhabi line."

171.    In late June 2004, dozens of federal agents connected to the FBI, Bureau of Immigration and Customs, and the IRS raided and searched IIAS as part of the U.S. government's on-going investigation into the school's links to radical Islam.

172.   On July 22, 2004, Senator Schumer introduced a resolution, co-sponsored by Senator Susan B. Collins, urging the State Department to add the Kingdom of Saudi Arabia to the U.S. list of religiously intolerant nations. Citing "Saudi efforts to export militant ideology" and "Saudi-funded schools and mosques [that] continue to teach hatred and preach violence around the world," the Schumer-Collins resolution called on Saudi Arabia to cease its support of religious ideologies that promoted hatred, intolerance, violence, and other abuses of international recognized human rights. Moreover, the resolution called on Saudi Arabia to cease providing undeserved diplomatic status to Islamic clerics and educators teaching outside of Saudi Arabia, and further demanded that the Kingdom close any Ministry of Islamic Affairs office in any Saudi Embassy that has been responsible for propagating intolerance.

173.   Authorities in the Netherlands took similar action as well. Based on evidence that Saudi-educated clerics and Saudi-funded mosques and other missionary organizations were propagating an intolerant Wahhabi ideology within Muslim communities in the Netherlands, and encouraging young Muslim men to engage in jihad, the Dutch Intelligence and Security Service ("AIVD") conducted surveillance of six Saudi-funded mosques that government officials maintain were consciously contributing to the radicalization of Muslims in the Netherlands.

174.   The mosques included the El Tawheed Mosque (Amsterdam), Al Fourqaan Mosque (Eindhoven), Sjeikh Al Islam Ibn Taymia (Hague), Al Mouahidine Mosque (Helmond), Society of Islamic Youth (Breda), and the Islamic Society for Education and Knowledge Transfer (Tilburg).

175.   Beginning in December 2001, the AIVD began closely monitoring the El Tawheed Mosque due to growing concerns of radical Egyptian and Saudi influences. The Saudi-based Al Haramain Islamic Foundation, designated by the U.S. Treasury Department as a

Specially Designated Global Terrorist ("SDGT") entity, was responsible for establishing and financing the mosque. In 2002, the AIVD identified a group of Muslim youth affiliated with the El Tawheed Mosque known as the "Hofstad Group." This group, an indigenous Islamist terrorist cell of approximately twenty young Dutch Muslims of mainly North African descent, met often at the mosque where they received inspiration to develop their skills as jihadists and were urged to travel abroad to wage jihad.

176.    In the summer of 2004, several members of the Hofstad Group were arrested for planning to launch terrorist attacks against Amsterdam International Airport Schipol, a nuclear reactor, and other targets. In November 2004, the group attracted international attention when a member, Mohammed Bouyeri, murdered Dutch filmmaker Theo van Gogh on an Amsterdam sidewalk in broad daylight.

177.    The Saudi-funded Al Fourqaan Mosque itself has a history of Islamic extremism and has been widely considered the most radical mosque in the Netherlands. For instance, the Al Fourqaan Mosque is closely affiliated with the Saudi-based Al Waqf Foundation, a Muslim cultural organization which opened its doors in Eindhoven in 1989 and operates from the Al Fourqaan Mosque itself. According to the AIVD, Al Waqf promotes the radical teachings of Wahhabi Islam and serves as a recruiting ground for jihad. Ahmad al Hussaini, the head of Al Waqf in Eindhoven and a member of its Board of Directors since June 1991, is a known financier of the Al Qaeda network. Hussaini transferred funds to Muhammad Galeb Zouaydi, Al Qaeda's principal financier in Europe.

178.    Al Waqf, which maintained close ties with Islamic primary schools in the Netherlands, frequently hosted educational courses and seminars as part of its effort to propagate

the Wahhabi strain of Islam and promote anti-Western sentiment. Attendance at the seminars became a critical credential for young Muslim men aspiring to join jihad.

179.    In early 1999, Hamburg cell members and future 9/11 hijackers Mohammad Atta and Marwan al Shehhi attended a religious training seminar hosted by Al Waqf at the Al Fourqaan Mosque. Following the seminar, Atta and Shehhi traveled to Al Qaeda camps in Afghanistan for training.

180.    Later that same year, Hamburg cell members Mounir el Motassadeq and Zakariya Essabar attended Al Waqf's Ramadan seminar at the Al Fourqaan Mosque. The five-day event was organized by the Saudi Ministry of Islamic Affairs. Not long after attending the seminar, Motassadeq also traveled to Afghanistan to train at an Al Qaeda-run camp.

181.    In June 2005, concerned that foreign-born and trained imams were becoming a threat to public order and national security, Dutch Immigration and Integration Minister Rita Verdonk announced the deportation of three radical imams from the Al Fourqan Mosque, accusing the men of radicalizing Muslims, recruiting men for jihad, and inciting violence within the mosque. The imams were also accused of using their sermons to urge Muslims to "isolate" themselves from the rest of Dutch society,

182.    Charged with "contributing to the radicalization of Muslims in the Netherlands" and "advocating violence through their militant, anti-Western sermons," the Dutch government deported Galal Osman Ahmed Kehil (a Saudi national), Eisha Eltayeb Bersham (a/k/a "Abu Tareq;" a Bosnian national), and Mohamud Mohamed Mohamud (a Kenyan national who studied at the University of Medina in Saudi Arabia).

183.    A fourth imam, from the Iskender Pasa Camil Mosque in Rotterdam, was also deported by Dutch authorities that same year for provoking hatred and inciting people to jihad.

184.    Under pressure from the United States, the Saudis themselves ultimately acknowledged the depth of the problem regarding the radical and extremist teachings of the Saudi-educated clerics connected to the Ministry of Islamic Affairs, albeit only after Al Qaeda carried out attacks within the Kingdom itself in 2003.

185.    Beginning in 2003, the Saudi government began to remove the most radical clerics within its ranks and sent others to rehabilitation programs for training and monitoring. According to a February 1, 2007 diplomat cable originating from the U.S. Embassy in Riyadh, approximately 2,000 extremist clerics were terminated by the government, while another 2,160 clerics were sent to education training programs.

## COUNT I
### SAUDI ARABIA'S LIABILITY FOR COMMITTING ACTS OF INTERNATIONAL TERRORISM THROUGH THE PROVISION OF MATERIAL SUPPORT AND FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339A and 18 U.S.C. § 2339C.

186.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

187.    Plaintiffs are nationals and citizens of the United States who were seriously injured or killed, or the heirs and survivors of those killed and injured, as a result of international terrorism financed, planned and perpetrated by Al Qaeda with the material support and assistance from the Kingdom of Saudi Arabia

188.    Saudi Arabia knew that its government officers, officials and agents were aiding and abetting Al Qaeda in the preparation, planning and coordinating of the September 11th Attacks.

189.     Saudi Arabia knew or should have known that the material support provided to Al Qaeda would be used to fund terrorist attacks against American citizens.

190.     The September 11th Attacks that injured Plaintiffs constituted violations of United States criminal law. These acts were supported directed and financed by Saudi Arabia.

191.     Defendants knowingly aided and abetted acts of international terrorism by providing logistical support and facilitating payments to Al Qaeda through charities and the international financial system. In doing so, Saudi Arabia was willing to, and did, commit numerous felonies under U.S. law and, in the course of doing so, violated 18 U.S.C. § 2339A by knowingly, or with deliberate indifference, providing material support Al Qaeda and knowing or being deliberately indifferent to the fact that such material support could be used to prepare for or carry out violations of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and/or 2332f.

192.     The September 11th Attacks were extreme and outrageous acts of terrorism and were committed with the intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reasons of those acts.

193.     The acts of the terrorists in killing or attempting to kill United States employees and citizens were intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence the policy of the United States government by intimidation or coercion, and (c) to affect the conduct of the government of the United States by mass destruction and murder.

194.     Defendants provided material support and resources to Al Qaeda and concealed and disguised the nature, location, source, and ownership of their material support and resources, knowing that they were to be used in preparation for, or in carrying out of international terrorism.

195.     Saudi Arabia is in violation of the Anti-Terrorism Act by providing material support and financial services to Al Qaeda which caused the Plaintiffs to suffer death and serious physical and mental injury.

196.     Defendants fraudulently and diligently concealed their material support of terrorists, and thereby prevented Plaintiffs from seeking redress for their injuries.

WHEREFORE   Plaintiffs, who are U.S. nationals, demand judgment in their favor against Defendants and demand damages in an amount to be determined b a jury for damages arising out of wrongful death, survival, intentional infliction of emotional distress, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in the finance and/or commission of crimes against humanity and other crimes against the people of the United States.

## COUNT II
## SAUDI ARABIA'S LIABILITY FOR ACTS OF TERRORISM TRANSCENDING NATIONAL BOUNDARIES IN VIOLATION OF 18 U.S.C. § 2332(b)

197.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

198.     Plaintiffs are nationals and citizens of the United States who were seriously injured or killed, or the heirs and survivors of those killed and injured, as a result of international terrorism financed, planned and perpetrated by Al Qaeda with the material support and assistance from the Kingdom of Saudi Arabia

199.     Defendant Saudi Arabia's material support for Al Qaeda, international terrorism, and the September 11th attacks transcended national boundaries in a circumstance described in 18 U.S.C. § 2332b(b).  *Inter alia*, Saudi Arabia's material support for the Al Qaeda terrorists and

the September 11th attacks described throughout this Complaint obstructed delayed, and/or affected interstate commerce; the victims and/or intended victims were members of the uniformed services, official, officer, employee, or agent of the legislative, executive, and/or judicial branches of the United States; the structure, conveyance, or other real or personal property was in whole or part owned, possessed, or leased by the United States.

200.    Saudi Arabia violated 18 U.S.C. § 2332b(a) when its conduct, transcending national boundaries in circumstances described in 18 U.S.C. § 2332b(b), directly and proximately caused the September 11th terrorist attacks, thereby directly and proximately causing Plaintiffs and Decedents to suffer serious bodily and/or death.

201.    Saudi Arabia's material support for the Al Qaeda terrorists created a substantial risk of serious bodily injury to Plaintiffs and Decedents by destroying or damaging the Twin Towers and the Pentagon on September 11, 2001 in New York and Virginia in violation of State and Federal law.

202.    Saudi Arabia knew that its government officers, officials and agents were aiding and abetting Al Qaeda in the preparation, planning and coordinating of the September 11th Attacks.

203.    Saudi Arabia knew or should have known that the material support provided to Al Qaeda would be used to fund terrorist attacks against American citizens.

204.    The September 11th Attacks that injured Plaintiffs constituted violations of United States criminal law. These acts were supported directed and financed by Saudi Arabia.

WHEREFORE   Plaintiffs, who are U.S. nationals, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury for damages arising out of wrongful death, survival, intentional infliction of emotional distress, loss of

consortium, loss of solatium, and/or loss of services, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in the finance and/or commission of crimes against humanity and other crimes against the people of the United States.

### COUNT III
### SAUDI ARABIA'S LIABILITY FOR DELIVERING AND DISCHARGING A LETHAL DEVICE INTO A PLACE OF PUBLIC USE IN VIOLATION OF 18 U.S.C. § 2332(f)

205.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

206.    Plaintiffs are nationals and citizens of the United States who were seriously injured or killed, or the heirs and survivors of those killed and injured, as a result of international terrorism financed, planned and perpetrated by Al Qaeda with the material support and assistance from the Kingdom of Saudi Arabia

207.    Defendant Saudi Arabia's material support for Al Qaeda, international terrorism, and the September 11th attacks on the Twin Towers and the Pentagon violated 18 U.S.C. § 2332f when it unlawfully caused multiple jet aircraft to intentionally crash into the Twin Towers (a place of public use) and Pentagon (a government facility) at high speed; the resulting explosion, fire, and structural damage caused the Twin Towers to collapse and caused significant damage to the Pentagon, directly and proximately causing Plaintiffs' and Decedents' injuries.

208.    The September 11th terrorist attacks on the Twin Towers and the Pentagon were performed with the intent to cause serious bodily injury or death.

209.    The September 11th terrorist attacks took place entirely within the United States and were committed against a government facility of the United States – namely, the United States Pentagon Building.

210.   A perpetrator of the September 11th attacks – namely, Osama Bin Laden – was found outside of the United States (in Pakistan) and was subsequently killed.

211.   The perpetrators of the September 11th attacks were nationals of another state – namely, Saudi Arabia, the United Arab Emirates, Egypt, and Lebanon.

212.   Victims of the September 11th attacks are believed to have included nationals of another state.

WHEREFORE   Plaintiffs, who are U.S. nationals, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury for damages arising out of wrongful death, survival, intentional infliction of emotional distress, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in the finance and/or commission of crimes against humanity and other crimes against the people of the United States.

## COUNT IV
## WRONGFUL DEATH

213.   Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

214.   The death of Patrick Dunn, decedent was directly and proximately caused by international terrorism financed, planned and perpetrated by Al Qaeda with the material support and assistance from the Kingdom of Saudi Arabia.

215.   Patrick Dunn who died on September 11, 2001 in the terrorist attack upon the Pentagon, is survived by his family members who are entitled to recover damages from

Defendant for wrongful death.  The family members are entitled to damages resulting from the death of Patrick Dunn caused by the actions of Defendant.

216.    As a further result of intentional and reckless acts, omissions, and other tortious conduct of the Defendant, Plaintiffs have been caused to expend various sums to raise the estates of Decedent and have incurred other expenses for which they are entitled to recover.

WHEREFORE  Plaintiffs, who are U.S. nationals, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury for damages arising out of the wrongful death of Patrick Dunn, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT V
## SURVIVAL

217.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

218.    Plaintiff Stephanie Ross Desimone, as the Personal Representative of the Estate, brings this action for damages suffered by the Estate of Patrick Dunn, including pain and suffering, inconvenience, loss of life and life's pleasures, loss of earnings and earning capacity, and other items of damages.

219.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

WHEREFORE  Plaintiffs, who are U.S. nationals, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury for damages

arising out of the wrongful death of Patrick Dunn, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT VI
## LOSS OF CONSORTIUM

220.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

221.    As a further direct and proximate cause of Defendant Saudi Arabia's material support for the Al Qaeda terrorist attacks on September 11, 2011, Plaintiff Stephanie Ross Desimone, wife of Patrick Dunn and Plaintiff Alexandra DeSimone sustained loss of services, comfort, society, and attentions in the past and future of Patrick Dunn, and suffered a loss of consortium to the detriment of the martial relationship and has suffered damages thereto.

WHEREFORE  Plaintiffs, who are U.S. nationals, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury for damages for loss of consortium, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (PLAINTIFF STEPHANIE ROSS DESIMONE, INDIVIDUALLY AND ON BEHALF OF
## THE ESTATE OF PATRICK DUNN)

222.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

223.    As a direct and intended consequence of the intentional and reckless actions of the Al Qaeda terrorists, which constituted extreme and outrageous conduct that is intolerable in a civilized society, assisted by the material support of the Kingdom of Saudi Arabia, which

supplied material support necessary to carry out the September 11th attacks, Plaintiff Stephanie Ross Desimone was caused, as a natural and continuous sequence of the actions of Saudi Arabia, to suffer severe mental and emotional distress which will continue for the balance of each Plaintiff's life, and each has thereby suffered significant damages as direct and proximate result of Saudi Arabia's conduct and material support for the terrorists behind the September 11th attacks on the Twin Towers and the Pentagon.

WHEREFORE Plaintiffs, who are U.S. nationals, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury for damages arising out of intentional infliction of emotional distress, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems.

## COUNT VIII
## PUNITIVE DAMAGES

224. Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

225. As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to kill, severely injure, and/or inflict personal injuries upon the Plaintiffs and the Plaintiffs decedents.

371. As set forth above, all Defendants conspired and agreed to provide material support and resources to Al Qaeda, and the bombers in furtherance of Al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the Pentagon and the Twin Towers.

372.    The Defendants' conspiracy resulted in the September 11th Attacks that killed, severely injured, and/or inflicted personal injuries upon the Plaintiffs and the Plaintiffs decedents.

373.    Defendants' outrageous actions can not be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

374.    As a result of the Defendants' tortious acts, Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

## DAMAGES

375.    As a direct and proximate result of the intentional, willful, reckless, and careless actions of the Defendants, Plaintiffs have suffered severe and permanent personal injuries, damages, and losses, including the following:

(a)    the severe mental anguish suffered by Plaintiffs;

(b)    the severe pain and suffering suffered by Plaintiffs;

(c)    loss of Decedent's earnings and future earning potential;

(d)    loss of Decedent's lives and life's pleasures;

(e)    costs relating to managing the estates of Decedent; and

(f)    death of the Decedent by way of murder as a result of the Defendant's conduct; and

(g)    Economic damages, solatium, pain and suffering, and punitive damages

376.    The aforementioned personal injuries, death and losses incurred by the Plaintiffs were caused by the intentional outrageous acts, recklessness, and carelessness of Defendant, acting individually and in concert, as well as other co-conspirators not yet identified, and of their

agents, servants and/or employees acting within and during the course and scope of their employment, authority, or apparent authority.

377.    Plaintiffs demand judgment in their favor in general damages against all Defendants, jointly, severally, and *in solido*

378.    Plaintiffs also request an award of legal interest, costs, and such other relief as this Honorable Court deems appropriate.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that the Court grant judgment in their favor and against the Defendants, jointly, severally, and *in solido* and grant to Plaintiffs:

·        Compensatory and punitive damages in favor of Plaintiffs and against Defendants jointly, severally, and *in solido*, in the amounts demanded in this Complaint for Damages;

·        Prejudgment interest or other appropriate interest;

·        Costs and expenses;

·        Attorney's fees; and

·        Such other and further relief as this Honorable Court may determine to be just and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues.

PLAINTIFFS, By Counsel

**THE MILLER FIRM, LLC**

Michael J. Miller, Esq.
(DC Bar No. 397689)
David J. Dickens, Esq.
DC Bar No. 1003499
108 Railroad Avenue
Orange, Virginia 22960
Tel: (540) 672-4224
Fax: (540) 672-3055